SO ORDERED,

*Neil P. Olack*

Judge Neil P. Olack
United States Bankruptcy Judge
Date Signed: September 14, 2015

**The Order of the Court is set forth below. The docket reflects the date entered.**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| **ANTHONY WAYNE BLALOCK,** | **CASE NO. 15-01281-NPO** |
| **DEBTOR.** | **CHAPTER 7** |
| **ANTHONY WAYNE BLALOCK** | **PLAINTIFF** |
| **VS.** | **ADV. PROC. NO. 15-00029-NPO** |
| **MISSISSIPPI DEPARTMENT OF REVENUE** | **DEFENDANT** |

### MEMORANDUM OPINION AND ORDER GRANTING MISSISSIPPI DEPARTMENT OF REVENUE'S MOTION TO DISMISS ADVERSARY COMPLAINT, OR, IN THE ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

This matter came before the Court at a hearing held on July 15, 2015 (the "Hearing") on the Mississippi Department of Revenue's Motion to Dismiss Adversary Complaint, or, in the Alternative, Motion for Summary Judgment (the "Motion") (Adv. Dkt. No. 6)[1] filed by the Mississippi Department of Revenue (the "MDOR"); Mississippi Department of Revenue's Memorandum of Authorities in Support of Motion to Dismiss (the "MDOR's Brief") (Adv. Dkt.

---

[1] Citations to docket entries in the above-referenced adversary proceeding (the "Adversary") are cited as "(Adv. Dkt. No. ____)" and in the above-styled bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. No. ____)".

No. 7) filed by the MDOR; Debtor/Plaintiff's Response in Opposition to Mississippi Department of Revenue's Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (the "Response") (Adv. Dkt. No. 38) filed by the debtor, Anthony Wayne Blalock (the "Debtor"); Debtor/Plaintiff's Brief in Opposition to Mississippi Department of Revenue's Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (the "Debtor's Brief") (Adv. Dkt. No. 44) filed by the Debtor; and Mississippi Department of Revenue's Reply to Debtor's Response in Opposition to Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (the "MDOR's Reply Brief") (Adv. Dkt. No. 45) filed by the MDOR in the Adversary.

At the Hearing, the MDOR was represented by Lara E. Gill, and the Debtor was represented by James G. McGee, Jr. At the conclusion of the Hearing, counsel for the Debtor asked the Court's permission to submit additional legal authorities addressing an alleged ambiguity in Mississippi law regarding the Debtor's obligation to file individual income tax returns. The Court granted his request, and the Debtor's counsel submitted a letter brief (the "Debtor's Letter Brief") (Adv. Dkt. No. 48) on July 17, 2015. Having considered the matter and being fully advised in the premises, the Court finds as follows:[2]

## Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of the Adversary pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (b)(2)(K). Moreover, 11 U.S.C. § 505(a) confers jurisdiction on this Court to determine the tax disputes in the Adversary. *See Fugitt v. Miss. Dep't of Revenue (In re Fugitt) (Fugitt I)*, No. 13-00098-NPO, 2014 WL 3888281, at *8-12 (Bankr. S.D. Miss. Aug. 8, 2014). Notice of the Motion was proper under the circumstances.

---

[2] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## Facts

For purposes of the Motion, the Court reviews the facts and inferences to be drawn from them in the light most favorable to the nonmoving party. *See Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co*., 336 F.3d 410, 412 (5th Cir. 2003).

1.      The Debtor owns and operates Blalock's Refrigeration in Liberty, Mississippi. The Debtor services and installs air conditioning and refrigeration units (Debtor Ex. A).  He operates Blalock's Refrigeration as a sole proprietorship, and the business is located at his personal residence.

2.      The Debtor has never filed a state sales tax return with the MDOR[3] or paid state sales taxes. Since 2004, he has not filed a state income tax return or paid state income taxes. (MDOR Ex. 3).

3.      The Debtor pays sales taxes to the suppliers of any parts and units that he purchases at retail, but he does not charge customers sales taxes for parts or services.

4.      The Debtor testified by affidavit that as a routine business practice, he borrowed money from his father, Aubrey Blalock, to pay his suppliers for air conditioning and refrigerator parts and units.  (Debtor Ex. A).  The loans purportedly were the result of an informal agreement between the Debtor and his father, and there are no documents or other paperwork evidencing their existence.  The MDOR produced the Debtor's testimony at the meeting of creditors held pursuant to 11 U.S.C. § 341 to show that his father paid the Debtor for parts and services that he provided to his father.  Thus, the deposits in his bank account from his father were either loans or payments for parts and services.

---

[3] Until 2009, the MDOR was known as the Mississippi State Tax Commission.  *See* MISS. CODE ANN. § 27-3-1 (1972).  For consistency, the Court refers only to the MDOR throughout this Opinion.

5.     With respect to the purported loans, the Debtor testified in his affidavit that the suppliers of the air conditioning and refrigerator parts and units required him to pay on a "COD" or "cash on delivery" account basis.  (Debtor Ex. A).  As he further explained in his affidavit, upon delivery of a part or unit, the Debtor wrote a check to the supplier on his account that included payment of a sales tax. According to the Debtor, he then charged the customer for repair and/or installation services and the cost of the part or unit purchased from the supplier, but he did not charge or collect any sales tax.  If the customer had not yet paid the Debtor when the supplier delivered the part or unit, the Debtor testified that his father loaned him the funds necessary to cover the amount of the check written to the supplier.  The Debtor maintained that he, in turn, wrote a check made payable to his father in the amount of the loan, but his father would not deposit the check immediately.  Instead, his father waited to deposit the check until the customer him, according to the Debtor. The Debtor further testified by affidavit that "this process . . . created the illusion that there were more taxable deposits than actually received by Blalock's Refrigeration."  (Debtor Ex. A).  His father submitted an affidavit that supported the Debtor's testimony regarding the purported loans. (Debtor Ex. B).

6.     The MDOR disputes the Debtor's affidavit testimony that he received any loans from his father.  According to the MDOR, out of all of the transactional items introduced into evidence by the Debtor, there is no check made payable to the Debtor's father that would indicate repayment of a loan. (Debtors Exs.  P-T).

7.     The Debtor applied for a Mississippi sales tax permit (the "Sales Tax Permit") (MDOR Ex. 1) on May 14, 2009.  *See* MISS. CODE ANN. § 27-65-27 (requiring any person who engages in any business that will subject such person to a privilege tax to apply for a permit).  In the application, the Debtor certified that:

> I hereby apply for the appropriate permit(s) to engage in business. I agree to pay any and all taxes due the State of Mississippi and to comply fully in all respects with the applicable Mississippi Tax Laws and any corresponding rules and regulations.

(MDOR Ex. 1). The Debtor's stated purpose for applying for the Sales Tax Permit was to enable him to purchase air conditioning and refrigerator parts and units at wholesale without having to pay sales taxes to suppliers. (Debtor Ex. A). He never fulfilled this purpose. Although he was issued a Sales Tax Permit, he did not begin charging his customers a sales tax, with limited exceptions, but he did continue paying a sales tax on purchases from suppliers. There is a remark in the audit and work papers of Stephanie Parks ("Parks"), an accountant employed by the MDOR, that the Debtor never registered for the Sales Tax Permit. (MDOR Ex. 3). Considering that both the application for the Sales Tax Permit (MDOR Ex. 1) and the Notice of Intent to Revoke Sales Tax Permit (MDOR Ex. 17) issued by the MDOR appear in the record, the Court finds in favor of the Debtor that he did apply for and obtain a Sales Tax Permit.

8.      The MDOR began its first audit of the Debtor for sales taxes and individual income taxes on July 14, 2009. (MDOR Exs. 3 & 4).

**Sales Taxes**

9.      The Debtor was audited by the MDOR for sales taxes for the periods of January 1, 2005 through December 31, 2008; January 1, 2009 through July 31, 2009; and August 1, 2009 through December 31, 2011. (MDOR Exs. 2-8, 10-13, 15-16, 18-25 & 27). These audits were conducted in conjunction with the individual income tax audits, and some of the correspondence to the Debtor pertains to both audits. (MDOR Exs. 2, 10-11, 13, 18, 21 & 22).

10.    MDOR's auditors used the cash flow method[4] for the Debtor's sales tax assessments.  (MDOR Exs. 2-8, 12, 19-24); MISS. CODE ANN. § 27-65-23.

11.    As a result of the audits, the MDOR determined that the Debtor had failed to report taxable sales during the period of January 1, 2005 through December 31, 2011.

12.    For the periods of January 1, 2005 through December 31, 2008, and January 1, 2009 through July 31, 2009, Parks conducted the sales tax audit of the Debtor (MDOR Exs. 4-10 & 12), and for the period of August 1, 2009 through December 31, 2011, Keri Davis ("Davis"), an accountant employed by the MDOR, conducted the audit.  (MDOR Exs. 18 & 19).

**Sales Tax Audit:  Jan. 1, 2005-Dec. 31, 2008 & Jan. 1, 2009-July 31, 2009**

13.    Parks notified the Debtor in a letter dated June 9, 2009 that a sales tax examination had been initiated for the period beginning January 1, 2005.  (MDOR Ex. 2).

14.    Parks met in person with the Debtor's accountant, John H. Steele ("Steele"), on July 14, 2009.  At that meeting, Steele gave Parks copies of bank statements, purchase invoices, and sales invoices, but did not provide all of these documents for the audit period.  Afterwards, Parks contacted Steele requesting the remaining records. (MDOR Ex. 3).

15.    When she did not receive the additional information, Parks sent a letter dated September 3, 2009 to the Debtor and Steele with an attached copy of the Sales Tax Audit of Blalock's Refrigeration (MDOR Exs. 10 & 11).  Parks explained in her letters that "[e]stimates have been made due to the lack of records provided by the taxpayer" and that she was sending them the Sales Tax Audit "since there has been no response to my telephone calls or emails requesting the remaining records."  (*Id*.).  She notified them that any "[a]udit adjustments [would] have to be received in my office by September 18, 2009."  (*Id.*)

_____

[4] The cash flow method examines the movement of cash through a business.  BLACK'S LAW DICTIONARY 260 (10th ed. 2014).

16.     On September 17, 2009, Steele provided Parks with more bank statements, sales invoices, and purchases invoices. (MDOR Ex. 4). Additionally, he provided spreadsheets with deposit dates and amounts for each of the audit years (the "Spreadsheets").[5] The Debtor apparently informed Parks that the deposits on the Spreadsheets represented loans from a check-cashing company used to cover purchases from suppliers. Later, in the Response, in the Debtor's Brief, and at the Hearing, the Debtor maintained that the deposits on the Spreadsheets reflected other loans, purportedly from his father. Parks updated the Sales Tax Audit based on the records provided by Steele and notified the Debtor on January 7, 2010 that the sales tax assessment had been reduced. (MDOR Ex. 13). Parks also requested that any disagreements as to the adjustments be submitted no later than January 15, 2010.

17.     On February 9, 2010, the MDOR sent the Debtor the Assessment of Sales Taxes for the period of January 1, 2005 through December 31, 2008 (the "2005-2008 Sales Tax Assessment"). (MDOR Ex. 15). The 2005-2008 Sales Tax Assessment demanded payment of $62,256.00, consisting of "Additional Tax Due" of $43,853.00 and "Interest and/or Damage[s]" of $18,403.00.

18.     Also on February 9, 2010, the MDOR sent the Debtor the Assessment of Sales Taxes for the period of January 1, 2009 to July 31, 2009 (the "2009 Sales Tax Assessment"). (MDOR Ex. 16). The 2009 Sales Tax Assessment demanded payment of $10,534.00, consisting of "Additional Tax Due" of $8,889.00 and "Interest and/or Damage[s]" of $1,645.00.

19.     The Debtor did not remit payment of the unpaid sales taxes to the MDOR.

20.     On August 17, 2011, the MDOR issued the Notice of Intent to Revoke Sales Tax Permit on the ground the Debtor had "continuously failed to report and pay sales and use taxes as

---

[5] The Spreadsheets were not introduced into evidence.

required by law." (MDOR Ex. 17); *see* MISS. CODE ANN. §§ 27-65-13, -23. The Debtor continued to operate Blalock's Refrigeration after the revocation of the Sales Tax Permit. (Bankr. Dkt. No. 10 at 19).

21.    In early 2012, the Debtor provided copies of more bank deposits that resulted in amendments in the original sales tax audits. (MDOR Exs. 5 & 7). As a result, the 2005-2008 Sales Tax Assessment was amended on May 14, 2012, to reflect an "Additional Tax" of $40,654.00 and "Damages" of $28,667.00 (MDOR Ex. 5), and the 2009 Sales Tax Assessment was amended on May 29, 2012, to reflect an "Additional Tax" of $10,339.00 and "Damages" of $4,808.00 (MDOR Ex. 7).

**Sales Tax Audit:  Aug. 1, 2009-Dec. 31, 2011**

22.    Davis notified the Debtor that a sales tax examination had been initiated for the period beginning August 1, 2009 in a letter dated January 3, 2012. (MDOR Ex. 18).

23.    On December 11, 2012, the MDOR sent the Debtor the Assessment of Sales Taxes for the period of August 1, 2009 to December 31, 2011 (the "2009-2011 Sales Tax Assessment") by regular mail. The 2009-2011 Sales Tax Assessment demanded payment of $37,455.00, consisting of "Additional Tax Due" of $27,307.00 and "Interest and/or Damages" of $10,148.00. (MDOR Ex. 27).

24.    The Debtor did not file any sales tax returns for the audit periods.

25.    The Debtor did not remit payment to the MDOR or contest the 2005-2008 Sales Tax Assessment, the 2009 Sales Tax Assessment, or the 2009-2011 Sales Tax Assessment

2e08cb6e06aa68c0

(together, the "Sales Tax Assessments").  In total, the Sales Tax Assessments demanded payment of additional sales taxes and damages of $121,923.00.[6]

**Individual Income Taxes**

26.     The Debtor was audited by the MDOR for individual income taxes for the periods of January 1, 2005 through December 31, 2008, and January 1, 2009 through December 31, 2011. Parks and Davis conducted the audits. (MDOR Exs. 14 & 26).

27.     Audits are generally conducted in three (3)-year periods.  For the period of January 1, 2005 through December 31, 2008, Parks audited the Debtor for individual income taxes (MDOR Exs. 8 & 9), and for the period of January 1, 2009 through December 31, 2011, Davis conducted the audit.  (MDOR Exs. 20 & 26).

28.     As a result of the audits, the MDOR determined that the Debtor had failed to report certain taxable individual income.

29.     On February 5, 2010, the MDOR sent the Assessment of Individual Income Taxes (the "2005-2008 Income Tax Assessment") (MDOR Ex. 14) for the period of January 1, 2005 through December 31, 2008 to the Debtor.  The 2005-2008 Income Tax Assessment demanded payment of $25,293.00, consisting of "Additional Tax Due" of $16,134.00 and "Interest and/or Damages" of $9,159.00.  (MDOR Ex. 14).

30.     Parks sent a letter dated April 24, 2012 to the Debtor that the bank information provided to Davis for the individual income tax audit for the period of January 1, 2005 through December 31, 2008 had been reviewed, that numerous attempts to contact him by telephone had been made with no response, and that all adjustments that could be made at the time had been made.  (MDOR Ex. 21).

---

[6] $121,923.00 = $69,321.00 (2005-2008 Sales Tax Assessment) + $15,147.00 (2009 Sales Tax Assessment) + $37,455.00 (2009-2011 Sales Tax Assessment).

31.    Parks sent another letter dated May 14, 2012 to the Debtor by certified mail, return receipt requested, notifying him that the bank information provided to Davis for the individual income tax audit for the period of January 1, 2005 through December 31, 2008 had been reviewed and that there had been numerous attempts to contact the Debtor by telephone with no response.  (MDOR Ex. 22).  The Debtor again was advised that all adjustments that could be made at that time had been completed and the updated audit assessment and work papers were being submitted.  (*Id.*).  The individual income tax audit was updated, and the 2005-2008 Income Tax Assessment was amended to demand payment of $29,289.00, reflecting an "Additional Tax" of $14,869.00 and "Damages" of $14,420.00 (Debtor Ex. M).

32.    An "Audit Assessment" for individual income taxes for the period of January 1, 2009 through December 31, 2011 (the "2009-2011 Income Tax Assessment") was sent to the Debtor on December 7, 2012 by regular mail, demanding payment of $26,324.00, consisting of "Income Tax" of $19,691.00, "Income Penalty" of $2,277.00 and "Income Interest" of $4,356.00, by February 5, 2013. (MDOR Ex. 26).

33.    The Debtor did not remit payment or contest the 2005-2008 Income Tax Assessment or the 2009-2011 Income Tax Assessment (together, the "Income Tax Assessments").  In total, the Income Tax Assessments demanded payment of additional income taxes and damages of $55,613.00.[7]

**Bankruptcy Cases & Adversary**

34.    The Debtor filed his voluntary chapter 7 petition for relief (the "Petition") (Bankr. Dkt. No. 1) on April 17, 2015.  In Schedule E-Creditors Holding Unsecured Priority Claims, the

---

[7]  $55,613.00 = $29,289.00 (2005-2008 Income Tax Assessment) + $26,324.00 (2009-2011 Income Tax Assessment).

Debtor listed a debt of $212,225.91 owed to the MDOR for "Sales Tax from '08-'11 and Income Tax from '08-'11." (Bankr. Dkt. No. 10 at 10).

35.     On the same day he filed the Petition, the Debtor filed the Complaint Initiating Adversary Proceeding (the "Complaint") (Adv. Dkt. No. 1). The Complaint consists of two counts. In count one, the Debtor asks the Court to determine the legality and amount of taxes owed to the MDOR. In count two, the Debtor seeks a determination from this Court that the taxes owed to the MDOR are dischargeable in his Bankruptcy Case.

36.     On August 18, 2015, the Debtor was granted a discharge under 11 U.S.C. § 727 of all of his dischargeable debts. (Bankr. Dkt. No. 24).

### Discussion

As a threshold matter, the Court considers the MDOR's contention in the Motion that the Debtor lacks standing to assert the claims alleged in the Complaint.

**A.     Standing to Dispute Tax Debt & Raise Dischargeability Issue**

There are two aspects of standing—"constitutional standing" and "statutory standing." *City of Farmers Branch v. Pointer (In re Pointer)*, 952 F.2d 82, 85 (5th Cir. 1992). Constitutional standing asks "'whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)). Statutory standing asks "whether the movant is within the zone of interests sought to be protected by the statutory scheme." *Id.* The MDOR's standing argument is unclear. Because the MDOR does not contest this Court's constitutional authority and stakes its position on provisions of the Bankruptcy Code, the Court interprets its argument as raising a question of statutory standing.

For its statutory standing argument, the MDOR cites *Hancock Bank v. Jefferson (In re Jefferson)*, 73 B.R. 183 (S.D. Miss. 1986).  In *Jefferson*, Hancock Bank filed a motion for relief from the automatic stay to allow it to foreclose on certain real property.  The debtors filed a counterclaim seeking compensatory and punitive damages for Hancock Bank's alleged fraudulent procurement of a deed of trust on real property in which a debtor owned a one-third interest.  The bankruptcy court entered an order modifying the stay in favor of Hancock Bank and dismissing the debtors' counterclaim without prejudice.  In support of the dismissal, the bankruptcy court observed that once the debtors initiated their chapter 7 case, the assets (and any claims to assets) of the bankruptcy estate passed to the chapter 7 standing trustee who was the proper party in interest.  For this same reason, the district court determined that the chapter 7 debtors were not "persons aggrieved" and, thus, lacked standing to prosecute an appeal from the order dismissing their claim.  *Id.* (citations omitted)

The MDOR's standing argument apparently is based on an assertion that, like the counterclaim in *Jefferson*, the claims alleged by the Debtor seeking a determination of the legality, amount, and dischargeability of his assessed tax debt belong to the bankruptcy estate, not to the Debtor.  According to the MDOR, the duly-appointed chapter 7 trustee in the Bankruptcy Case has exclusive standing to assert the Debtor's claims by virtue of 11 U.S.C. § 323.  The MDOR contends that under that statute, the role of a chapter 7 trustee is to represent the bankruptcy estate.  Indeed, the MDOR argues that one of the primary duties of a trustee is to marshal and sell assets so that they can be distributed to the unsecured creditors of the estate, and he is the only person with standing to collect and administer property of the estate for the benefit of those creditors.  11 U.S.C. § 704(a)(1)-(12) (2012) (listing duties of a trustee).

The Court finds that the MDOR's reliance on *Jefferson* is misplaced. The Debtor here is not disputing an interest in an asset of the bankruptcy estate that requires administration by the chapter 7 trustee. Instead, the Debtor is seeking a determination of the legality, amount, and dischargeability of his tax liabilities, which are issues governed by the Bankruptcy Code. *Sarfani, Inc. v. Miss. Dep't of Revenue (In re Sarfani, Inc.)*, 527 B.R. 241, 247 (Bankr. N.D. Miss. 2015). The Debtor has the right to seek an adjudication of the legality and amount of assessed tax debt under 11 U.S.C. § 505(a). Likewise, he has the right to seek a dischargeability determination under 11 U.S.C. § 523(a). These rights affect the Debtor's liability and the scope of his discharge. The Court, therefore, concludes that the Debtor has statutory standing to bring his claims against the MDOR.

## B.      Motion to Dismiss

With respect to its request for dismissal of the Complaint in the Motion, the MDOR relies on Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"), as made applicable to the Adversary by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. In deciding a Rule 12(b)(6) motion, a court generally may not "go outside the complaint." *Rodriquez v. Rutter*, 310 F. App'x 623, 626 (5th Cir. 2009) (citing *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). An exception to the general rule allows a court to consider documents attached to a motion to dismiss if they are referred to in the complaint and are central to a claim. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citing *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004)). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Carter v. Target Corp.*, 541 F. App'x 413, 416-17 (5th Cir. 2013) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d

496, 499 (5th Cir. 2000)). If, however, a court considers documents outside the complaint that do not meet this exception, it must treat the motion to dismiss as a motion for summary judgment. *See* FED. R. CIV. P. 12(d) (as adopted by FED. R. BANKR. P. 7012(b)). In the event a motion to dismiss is converted to a summary judgment motion, a court must give the parties notice of the conversion and a reasonable opportunity to respond before it may consider the documents and any other evidence presented. *Id.*

Here, the Debtor did not attach any documents to the Complaint, and it did not expressly refer to any documents. The Debtor, however, attached twenty (20) items, marked as Exhibits "A" through "T" (Adv. Dkt. Nos. 38-1 to 43-3), to his Response and an unmarked document (Adv. Dkt. No. 48-1) to the Debtor's Letter Brief.[8] The MDOR attached twenty-seven (27) items, marked as Exhibits "1" through "27" (Adv. Dkt. Nos. 11-37), to the MDOR's Brief, and three (3) additional items, marked as Exhibits "1" through "3" (Adv. Dkt. Nos. 45-1 to 45-3), to the MDOR's Reply Brief.[9] Because of the volume and nature of materials submitted by the Debtor and the MDOR, including four (4) affidavits,[10] the Court finds that these matters fall outside the scope of the Complaint and do not fit within the narrow exception that allows a court to consider documents outside of the pleadings in deciding a Rule 12(b)(6) motion. Additionally, because the MDOR requested summary judgment in the Motion as alternative relief to its request for dismissal of the Complaint, the Court finds that the Debtor has been

---

[8] The twenty (20) lettered items introduced into evidence by the Debtor (Adv. Dkt. Nos. 38-1 to 43-3) are cited in this Opinion as "(Debtor Ex. _____)". The item attached to the Debtor's Letter Brief (Adv. Dkt. No. 48-1) is cited as "(Debtor Letter Br. Ex.)".

[9] The first twenty-seven (27) numbered items introduced into evidence by the MDOR are cited in this Opinion as ("MDOR Ex. _____)". To avoid confusion, the final three (3) items (Adv. Dkt. Nos. 45-1 to 45-3) introduced into evidence by MDOR are cited as "(MDOR Ex. 1a)"; "(MDOR Ex. 2b)"; and "(MDOR Ex. 3c)".

[10] *See* Debtor Exs. A-B; MDOR Exs. 1a & 2b.

afforded sufficient notice of the conversion of its request for dismissal. Accordingly, the Court treats the request for dismissal in the Motion as a summary judgment motion and addresses only the summary judgment request.

## C.      Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), as made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that summary judgment shall be granted if the moving party shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of identifying those portions of the record that demonstrate the absence of any genuine issue of material fact. *Lincoln Glen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out the absence of evidence supporting the non-movant's case. *Duffy v. Leading Edge Prods. Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (citations omitted).

If the moving party meets its initial burden, the burden of production shifts to the non-movant, who must present evidence of specific facts that go beyond the pleadings that show there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *Littlefield v. Forney Indep. Sch. Dist*., 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quotations omitted). In reviewing whether a genuine issue of material fact has been created, the Court reviews the facts

and the inferences to be drawn from them in the light most favorable to the non-movant. *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir. 1986). The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings. *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002), *overruled on other grounds, Grand Isle Shipyard Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009). Likewise, the non-movant's burden of demonstrating a genuine issue of material fact is not satisfied by merely creating some metaphysical doubt as to the material facts by "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 399 (5th Cir. 2008); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994). The non-movant must present specific facts showing "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc*., 144 F.3d 377, 380 (5th Cir. 1998)). In the absence of any proof, the Court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075. The Court may not make any credibility determinations or weigh any evidence. *Chaney v. Dreyfus Serv. Corp*., 595 F.3d 219, 229 (5th Cir. 2010).

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. Fed. R. Civ. P. 56(c)(4). A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary. *See In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000).

Although the Court may consider all materials in the record when deciding a summary judgment, "the court need consider only the cited materials." Fed. R. Civ. P. 56(c)(3). "When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the

motion for summary judgment, that evidence is not properly before the . . . court.  Rule 56 does not impose upon the . . . court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (citations omitted).

## D.     Determination of Legality & Amount of Taxes

The Debtor's request for relief in the Complaint arises out of the assessments made by the MDOR.  An assessment, according to the U.S. Supreme Court, "refers to the official act of recording of a taxpayer's liability, which occurs after information relevant to the calculation of that liability is reported to the taxing authority."  *Direct Marketing Ass'n v. Brohl*, 135 S. Ct. 1124, 1130 (2015).   The MDOR assessed the Debtor sales taxes of $121,923.00 for the tax years January 1, 2005 through December 31, 2011, and individual income taxes of $55,613.00 for the same period.

The Debtor contends that he was not required to pay sales taxes because he purchased the units and parts at the resale rate and the Mississippi statutory tax scheme is ambiguous as to whether it applies to services or to subsequent retail sales transactions.   Next, the Debtor contends that he was not required to pay income taxes for the same period in question because Blalock's Refrigeration did not operate at a profit.  The Debtor, in the alternative, challenges the accuracy of the amounts of the assessments.  The MDOR argues that the assessments are presumptively valid as a matter of law and the Debtor cannot make a threshold showing that they are arbitrary and capricious.  Moreover, the MDOR contends that there is no genuine dispute that the Debtor's sales and income tax obligations for the tax years of January 1, 2005 through December 31, 2011 are nondischargeable under applicable bankruptcy law.

1.       **Sales Tax-Legality**

The taxation of sales in Mississippi is governed by the Mississippi Sales Tax Law, Miss. Code Ann. §§ 27-65-1 to -111.   The Mississippi Sales Tax Law, with certain exceptions, assesses on "every person engaging or continuing within this state in the business of selling any tangible personal property whatsoever . . . a tax equal to seven percent (7%) of the gross proceeds of the retail sales of the business."  *Id*. § 27-65-17(1)(a).  The statute, entitled "Selling tangible personal property wholesale and retail," levies a privilege tax on persons engaged in business in Mississippi.  The terms "taxpayer," "sales," "gross proceeds of sales," and "tangible personal property" are defined in Miss. Code Ann. § 27-65-3, as follows:

(e)       "Taxpayer" means any person liable for or having paid any tax to the State of Mississippi under the provisions of this chapter.  A taxpayer is required to obtain a sales tax permit under Section 27-65-27 before engaging in business in this state.  If a taxpayer fails to obtain a sales tax permit before engaging in business in this state, the taxpayer shall pay the retail rate on all purchases of tangible personal property and/or services in this state, even if purchased for resale.  Upon obtaining a sales tax permit, a previously unregistered taxpayer shall file sales tax returns for all tax periods during which he engaged in business in this state without a sales tax permit, and report and pay the sales tax accruing from his operation during this period and any applicable penalties and interest.

(f)       "Sale" or "sales" includes the barter or exchange of property as well as the sale thereof for money or other consideration, and every closed transaction by which the title to taxable property passes shall constitute a taxable event.  "Sale" shall also include the passing of title to property for a consideration of coupons, trading stamps or by any other means when redemption is subsequent to the original sale by which the coupon, stamp or other obligation was created.

* * *

(h)       "Gross proceeds of sales" means the value proceeding or accruing from the full sale price of tangible personal property, including installation charges without any deduction for delivery charges, cost of property sold, other expenses or losses, or taxes of any kind except those expressly exempt by this chapter.

* * *

(j)      "Tangible personal property" means personal property perceptible to the human senses or by chemical analysis as opposed to real property or intangibles and *shall include property sold on an installed basis which may become a part of real or personal property.*

*Id*. § 27-65-3(e), (f), (h) & (j) (emphasis added). "Retail sales" and "wholesale sales" are defined separately.  "Retail sales" are defined as "sales of tangible personal property except those defined herein as wholesale."  *Id*. § 27-65-7.  Wholesale sales, in turn, are defined as sales of tangible personal property "for resale in the regular line of business," when made in good faith to a retailer regularly selling or renting that property" and "when the dealer is licensed," having applied for and received a sales tax permit.  *Id*. § 27-65-5.

The MDOR contends that the Debtor was selling and installing tangible personal property during the periods at issue and that such activities are subject to a sales tax under MISS. CODE ANN. § 27-65-17(a)(1).  The MDOR points out that the nature and scope of the Debtor's business activities are undisputed in the record; the Debtor repaired and installed air conditioning and refrigeration units. (Bankr. Dkt. No. 10 at 14 & 19).  Consequently, the MDOR claims that the Debtor was required to apply for a sales tax permit to conduct business in Mississippi and keep adequate records of his business activities under MISS. CODE ANN. § 27-65-27.  (Debtor Ex. C). That the Debtor later applied for, and obtained the Sales Tax Permit, according to the MDOR, supports its view that the Debtor understood he was engaged in business activities that obligated him to pay sales taxes.  Specifically, the MDOR relies on the certification in the application for the Sales Tax Permit that appears immediately above the Debtor's signature in which he "agree[d] to pay any and all taxes due the State of Mississippi and to comply fully in all respects with the applicable Mississippi Tax Laws and any corresponding rules and regulations."  (Debtor Ex. C).  There is also evidence in the record that the Debtor collected sales tax from at least one

customer. A schedule of sales invoices prepared by an auditor with the MDOR includes an invoice dated January 30, 2008 for parts sold to Vine Brothers, Inc. in the amount of $705.00. (Adv. Dkt. 14 at 150). The same schedule of sales invoices shows that the Debtor collected an additional $49.35 from Vine Brothers, Inc., an amount that is seven percent (7%) of $705.00.[11]

The Debtor argues that his application for, and the issuance of the Sales Tax Permit does not prove that he knew or believed he was subject to a sales tax. He contends that he cannot be taxed for "services" he provided his customers. Also, because the Debtor purchased parts and units at retail prices and paid his suppliers a sales tax, he maintains that it was reasonable for him to assume he was not required to charge a sales tax to his customers for the installed part or unit. The Debtor insists that the Mississippi Sales Tax Law is ambiguous and could be viewed as applying solely to retail sales purchased at wholesale and then resold. He cites *State Tax Commission v. Edmonson*, 196 So. 2d 873 (Miss. 1967), for the proposition that "a taxing statute must be strictly construed against the taxing power and in favor of the taxpayer, and all doubts as to whether or not a tax has been imposed must be resolved in favor of the taxpayer." *Id*. at 876; s*ee also Castigliola v. Miss. Dep't of Revenue*, 162 So. 2d 795 (Miss. 2015) (holding that under Mississippi law, the MDOR carries the burden to show that a particular taxing power applies to a particular transaction).

The MDOR counters that regardless of the Debtor's beliefs and assumptions, the definition of "tangible personal property" in Miss. Code Ann. § 27-65-3 renders the distinction drawn by the Debtor between sales and services irrelevant. "Tangible personal property" includes "property sold on an installed basis which may become a part of real or personal property." Miss. Code Ann. § 27-65-3. Although the Debtor would receive credit for any sales

---

[11] $49.35 = $705.00 x 0.07.

tax paid on component materials he purchased at retail (if the purchases were verified),[12] he would still be required by MISS. CODE ANN. § 27-65-17(1)(a) to collect a sales tax on the subsequent sale and installation of tangible personal property, according to the MDOR. Moreover, the MDOR points out that even if the Court were to interpret MISS. CODE ANN. § 27-65-7(1)(a) in the manner urged by the Debtor, the Debtor is engaged in certain miscellaneous business activities on which Mississippi levies a seven percent (7%) sales tax on the "gross income" of the business under MISS. CODE ANN. § 27-65-23.[13] "Gross income" is defined in MISS. CODE ANN. § 27-65-3 as follows:

> "Gross income" means the total charges for service or the total receipts (actual or accrued) derived from trades, business or commerce by reason of the investment of capital in the business engaged in, including the sale or rental of tangible personal property, *compensation for labor and services performed*, and including the receipts from the sales of property retained as toll, without any deduction for rebates, costs of property sold, cost of materials used, labor costs, interest paid, losses or any expense whatever.

*Id*. § 27-65-3(i) (emphasis added).   Thus, according to the MDOR, sales tax for certain miscellaneous business activities is based on the "gross income" a business derives from both its

---

[12] "[W]hen a taxpayer sells merchandise and has paid a rate equal to the retail rate of tax on the purchase price to a wholesaler, the taxpayer may take credit for the tax paid to the wholesaler from the tax due on the sale of the merchandise specifically included in his return to the commissioner."  MISS. CODE ANN. § 27-65-5

[13] MISS. CODE ANN. § 27-65-23, entitled "Miscellaneous businesses," provides, in pertinent part:

> Upon every person engaging or continuing in any of the following businesses or activities there is hereby levied, assessed and shall be collected a tax equal to seven percent (7%) of the gross income of the business, except as otherwise provided:
>
> > Air conditioning installation or repairs;
> > * * *
> > Refrigerator equipment repairs.

*Id*.

sales and services, and not just on its purchases of parts and units from suppliers, as the Debtor argues. Because Blalock Refrigeration involves "[a]ir conditioning installation or repairs" and "[r]efrigerating equipment repairs," the MDOR contends that the Debtor is subject to sales tax under MISS. CODE ANN. § 27-65-23 without regard to the retail sales issue.

The Court agrees with the MDOR that there is no ambiguity in Mississippi's statutory tax scheme regarding the Debtor's obligation to pay sales taxes. *See Coleman v. State*, 947 So. 2d 878, 881 (Miss. 2006) (citation omitted) ("When the words of a statute are plain and unambiguous, there is no room for interpretation or construction, and we apply the statute according to the meaning of those words."). Applying the plain and unambiguous language of the sales tax statutes, as outlined by the MDOR, the Court concludes that the Debtor was engaged in business activities during the tax years in question that subjected him to payment of sales taxes. Although the Debtor correctly points out that taxing authority must be strictly construed under Mississippi law, the Court rejects the Debtor's attempt to rewrite Mississippi's statutory sales tax scheme to conform to his unfounded contention that sales taxes in Mississippi should be limited to retail sales purchased at wholesale and then resold.

State sales taxes vary in scope from state to state, due partly to history and partly to politics. WALTER HELLERSTEIN, STATE TAXATION ¶ 12.05 (3d ed. 2015). Mississippi enacted the first general sales taxes in the 1930s, and since then, has gradually expanded its sales tax base. Jerome R. Hellerstein, *The Scope of the Taxable Sale Under Sales and Use Tax Acts: Sales as Distinguished from Services*, 11 TAX L. REV. 261, 261 (1956). Some states have followed Mississippi's lead, but others have not. *Id.* The Debtor, however, does not point to any state or territory in the United States that has adopted his application of a retail sales tax, defined

by him as one that applies only to sales of goods (and not services) and only to those sales where a sales tax previously had not been paid on any component part.

In reaching the conclusion that the Sales Tax Assessments are valid as a matter of law, the Court does not consider relevant the Debtor's application to do business in this State or his collection of sales taxes from at least one customer. The legality of the Sales Tax Assessments is a question of law that rests on the plain language of the Mississippi Sales Tax Law. The Debtor has failed to meet his burden of proving that a genuine issue exists as to whether that law applies to his business activities.

Before turning to the Debtor's challenge to the accuracy of the Sales Tax Assessments, the Court considers an issue raised by the Debtor for the first time at the Hearing. As an additional challenge to the legality of the Sales Tax Assessments, the Debtor initially argued at the Hearing that he was denied procedural due process because he did not remember receiving any of the Sales Tax Assessments in the mail. After counsel for the MDOR produced copies showing that most of them had been mailed to the Debtor by certified mail, return receipt requested, and after the Debtor verified that his signature appeared on the return receipts, the Debtor narrowed his due process challenge to the 2009-2011 Sales Tax Assessment dated December 11, 2012 (MDOR Ex. 27) and the 2009-2011 Income Tax Assessment dated December 7, 2012 (MDOR Ex. 26). As explained by the MDOR's counsel, the 2009-2011 Sales Tax Assessment and the 2009-2011 Income Tax Assessment were sent to the Debtor by regular mail, not by certified mail, because of a 2010 amendment to MISS. CODE ANN. § 27-65-37, which substituted "regular mail" for "certified or registered mail."

The Debtor's due process claim was not raised in the Complaint, Response, or Debtor's Brief. The Fifth Circuit Court of Appeals has noted that a claim that is not raised in a complaint

but only in response to a summary judgment motion is not properly before the court.  *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005).  Notwithstanding the waiver issue, the Court finds no merit in the Debtor's argument because the record reflects that the MDOR sent both the 2009-2011 Sales Tax Assessment and the 2009-2011 Income Tax Assessment to the same address it mailed other notices by certified mail, return receipt requested, including the 2005-2008 Sales Tax Assessment, which the Debtor admits he received. Moreover, the Court finds that the Debtor's purported lack of memory alone does not create a disputed issue of fact sufficient to defeat summary judgment, especially given that the record does not show any fault with the service of the 2009-2011 Sales Tax Assessment.

### 2.      Sales Tax-Amount

Under the Mississippi Sales Tax Law, the lack of adequate records gives rise to a presumption that the MDOR's assessments of sales taxes are *prima facie* correct, as set forth below:

> If adequate records of the gross income or gross proceeds of sales are not maintained or invoices preserved as provided herein, or if an audit of the records of a taxpayer, or any return filed by him, or any other information discloses that taxes are due and unpaid, the commissioner shall make assessments of taxes, damages, and interest from any information available, which shall be prima facie correct.

MISS. CODE ANN. § 27-65-37(1).  In order for sales tax assessments to be *prima facie* correct, they must be made "from any information available," which, according to the Mississippi Supreme Court, need not be the best information available.  S*ee Marx v. Bounds*, 528 So. 2d 822, 826 (Miss. 1988).

The MDOR contends that its Sales Tax Assessments are entitled to the presumption of correctness under MISS. CODE ANN. § 27-65-37(1) because the auditors properly relied on the records provided by the Debtor to estimate the taxable sales of Blalock's Refrigeration using the

cash flow method.  (MDOR Exs. 1-8, 10-13, 15-25 & 27).  According to the MDOR, the Debtor

was required to preserve for three (3) years "adequate records of the gross income, gross receipts

or gross proceeds of sales of [Blalock's Refrigeration], including all invoices of merchandise

purchased, all bank statements and cancelled checks, and all other books or accounts that may be

necessary to determine the amount of tax for which he is liable."  MISS. CODE ANN. § 27-65-43.

Although the Debtor provided bank statements, purchase invoices, and sales invoices to the

MDOR, the records were incomplete.  Indeed, the Debtor told an auditor that he threw some of

the purchases invoices and sales invoices in the "trash."    (MDOR Ex. 4).  Consequently, the

MDOR estimated sales tax for three (3) years based on two (2) years of available information

provided by the Debtor.  As explained by Parks in the Sales Tax Audit report:

> The Bank Statements were recapped and credit was given for non-sale deposits
> for 2007 and 2009.  Deposits were estimated for 2005, 2006, and 2008.  Cash paid
> outs were calculated for 2007 and 2009.  Cash paid outs were estimated for 2005,
> 2006, and 2008, based on the 2007 and 2009 cash paid outs. . . . Sales tax paid for
> resale purchases to MS Vendors were scheduled.  The [Debtor] was given credit
> for the tax for 2007 and 2009.

(MDOR Ex. 5 at 2-3).   After Steele gave the Spreadsheets and more records to Parks on

September 17, 2009, the "new bank statements were recapped and credit was given for non-sale

deposits. . . . Cash paid outs were calculated.  The new sales invoices were scheduled."  (*Id*. at

3).  Years later, the Debtor provided additional bank deposits, and Parks once again amended the

Sales Tax Audit.  (MDOR Exs. 5 & 7).

        The Court finds that there is no genuine dispute that the Debtor failed to preserve sales

and purchases invoices and that the MDOR calculated the Sales Tax Assessments from "any

information available."  MISS. CODE ANN.  § 27-65-37(1).  Accordingly, the Court finds that the

MDOR has met the requirements of MISS. CODE ANN. § 27-65-37(1), and a presumption arises

that the Sales Tax Assessments are correct.  The Debtor, therefore, bears the burden of proof to

show the existence of a genuine dispute as to their accuracy.  (MDOR Exs. 5, 7 & 27; MDOR Exs. 9 & 26); *see Woodall v. C.I.R.*, 964 F.2d 361, 363 (5th Cir. 1992); *Gunkle v. C.I.R.*, 753 F.3d 502, 508 (5th Cir. 2014); *Davis v. United States*, No. 06-0158, 2008 WL 4534071, at *5 (W.D. La. Oct. 7, 2008).

The Debtor claims the Sales Tax Assessments are excessive because they were calculated by the MDOR's auditor "compiling the total amount of gross deposits into [the Debtor's] bank account and not from the total amount of sales that the business had." (Compl. ¶ 13). The Debtor further claims that "the original sales tax assessment . . . used speculative and capricious auditing techniques which totals $212,225.91," but does not allege that the cash flow method used by the auditors was *per se* speculative and capricious. (Compl. ¶ 14).  The Debtor does not support his claim with specific figures or calculations and does not identify an alternative method that would have yielded a more accurate result if employed by the auditors.  In short, the Debtor claims that the auditing techniques erroneously taxed the loan proceeds (given by the Debtor's father and the check-cashing company) deposited into his account as income received by Blalock's Refrigeration.

In support of his position, the Debtor attached copies of checks, deposit slips, and other transactional items dated from 2005 to 2009 totaling 567 pages[14] to the Response. (Debtor Exs. P-T).  The Debtor contends that he previously provided the MDOR with Spreadsheets outlining which of the deposits reflected in these exhibits constitute loan proceeds either from the Debtor's father that the Debtor repaid or from a check-cashing company.  (Debtor Exs. A & B).  According to the Debtor, if the auditors had taken out these non-taxable deposits, the Sales Tax

---

[14] This is not to say that the Debtor submitted only 567 transactional items into the record because each page contains from two (2) to twelve (12) items.  Therefore, the total number of items is actually a multiple of 567.

Assessments would have been much less. The Debtor was unable to show which deposits are non-taxable without the Spreadsheets, but "[u]pon receipt of the spreadsheet provided to the MDOR[,] the [Debtor] will be able to make a full accounting substantiating the claims that the assessments of income tax are grossly overstated and should be reduced."[15]  (Debtor's Br. at 10). The Debtor's counsel admitted at the Hearing, however, that there are no checks among any of the items introduced into evidence that show repayment of any loans to the father.

The MDOR disparagingly refers to the exhibits attached to the Response (except for the affidavits) as a "document drop" of checks, deposit slips, and other transactional items.  (Adv. Dkt. Nos. 38-43).  The MDOR contends that the Debtor failed to show which of the deposits in the "document drop" represent cash loans and that this Court is "under no duty to sift through the record in search of evidence to support a party's opposition to summary judgment."  *Smith v. CitiMortgage, Inc.,* No. 3:08cv492, 2009 WL 1976513, at *2 (S.D. Miss. July 7, 2009) (quotation omitted).  Additionally, at the meeting of creditors under 11 U.S.C. § 341, the Debtor testified that he performs work for his father "on his coolers and stuff . . . [doing] repair and refrigeration. I got 1099s for it."  (MDOR Ex. 3c).  This testimony explains why the "document drop" includes checks written to the Debtor by his father or his father's business.

More specifically, the MDOR disputes that the father ever loaned cash to the Debtor.  As part of the MDOR's Reply Brief, Parks and Davis, submitted affidavits in which they confirmed that the "document drop" does not include any checks made payable to the Debtor's father, a fact

---

[15] The Debtor did not file a motion or affidavit under Rule 56(d) asking the Court to defer consideration of the request for summary judgment to permit "discovery" of the Spreadsheets, which the Debtor apparently provided to the MDOR without retaining copies for himself.  Even if the Debtor had filed a Rule 56(d) motion and supporting affidavit, the Court finds that the Debtor would not meet the requirements for a continuance of this matter under Rule 56(d) for the reasons explained later in this Opinion. *See Anderson*, 477 U.S. at 250 n.5 (purpose of Rule 56(d) is to allow the non-moving party "the opportunity to discover information that is essential to his opposition").

that is not in dispute. (MDOR Exs. 1a & 2b). The MDOR contends that the Spreadsheets, even if found and introduced into evidence, are insufficient to rebut the *prima facie* correct Sales Tax Assessments because the Spreadsheets are unsupported by the Debtor's own bank records. For this proposition, the MDOR relies on *Marx*, where the Mississippi Supreme Court considered the type of evidence that is necessary to rebut the presumption in favor of tax assessments. *Marx*, 528 So. 2d at 826.

To estimate actual gross sales, the auditor in *Marx* relied on purchase invoices, to which he applied markups known to be used by the taxpayer at the time of the audit. From this estimate, the auditor determined that the taxpayer had underreported gross sales and assessed sales taxes. The auditor relied on the purchase invoices because there were no "records reflecting actual sales, . . . no sales invoices, no record of cash withdrawals, and no record of actual markups." *Id.* The taxpayer alleged that the sales taxes were improperly assessed because he sold goods at or below costs and, therefore, the actual markups were much lower than those applied by the auditor. The Mississippi Supreme Court concluded that the "undocumented recollections" of the taxpayer, when coupled with a failure by the taxpayer to maintain adequate records reflecting the true sales of the business, were insufficient to overcome the presumption of correctness. *Id.* at 827. The Mississippi Supreme Court cited with approval the policy considerations of the Tennessee Supreme Court in a similar case: "[T]his Court will not reward, directly or indirectly, the failure of a person to maintain adequate records of . . . sales . . . by setting aside an assessment of taxes on such sales because the Commissioner based his tax assessment on an estimate." *Id.* (citing *Stratton v. Johnson*, 707 S.W.2d 865, 867-68 (Tenn. 1986)).

With regard to the Spreadsheets, the Court agrees with the MDOR that they do not create a genuine dispute that would prevent summary judgment. The Spreadsheets were prepared by the Debtor in conjunction with the tax audits and are unsupported by any bank records or other documents. Under *Marx*, the Spreadsheets would be insufficient to rebut the statutory presumption of correctness. In addition to the Spreadsheets, however, the Debtor relies on his and his father's testimony by affidavit to defeat summary judgment. (Debtor Exs. A & B). The MDOR views the affidavits as self-serving and insists they have no greater effect on the presumption of correctness as the Spreadsheets for the reasons set forth in *Marx*.

The Court finds that the allegations in the affidavits are not "the type of 'significant probative evidence' required to defeat summary judgment." *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (citations omitted). Although the Fifth Circuit does not exclude an affidavit as incompetent for the sole reason that it contains self-serving allegations, it has recognized that "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002). *But see C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (noting that even if an affidavit is arguably self-serving, it may suffice to create a fact issue). Additionally, the Fifth Circuit has held that self-serving and unsupported statements in an affidavit will not preclude summary judgment where there is evidence to the contrary in the record. *Hinsley*, 201 F.3d at 643. This point is also made in *Marx*, that in the absence of any supporting documentation of the loan transactions, the Debtor cannot create a genuine issue. *Marx*, 528 So. 2d at 828.

The Debtor's arguments here resemble those considered by this Court in *Fugitt v. Mississippi Department of Revenue (In re Fugitt) (Fugitt II)*, Adv. Proc. No. 13-00098-NPO (Bankr. S.D. Miss. Oct. 27, 2014) (Dkt. No. 55). The debtors in *Fugitt II* challenged the MDOR's sales tax assessments for numerous reasons, but mainly because the auditor treated all cash proceeds as sales proceeds when some of the cash deposits allegedly consisted of loan proceeds.[16] The debtors failed to support their allegations with any actual sales records or specific figures or calculations. In *Fugitt II*, this Court found that the auditor properly relied on documents and other items provided by the debtors to estimate taxable sales using the cash flow method. The Court reaches the same conclusion in this Adversary. Without any summary judgment evidence demonstrating that the auditor's calculations were incorrect, that another more accurate estimate of sales tax existed, or that some flaw in the methodology existed, "this Court will not set aside a *prima facie* valid assessment." *Fugitt II*, slip op. at 15.

3.     **Income Tax**

Mississippi Income Tax Law imposes a tax upon the net income of every resident individual. MISS. CODE ANN. § 27-7-5. Moreover, "[e]very resident individual . . . earning income, or doing business in the State of Mississippi, and having a gross income for the taxable year in excess of the exemptions allowed hereunder, plus the standard deduction, shall make a return." *Id*. § 27-7-31(1). Returns of individuals are due by April 15th of each year. *Id*. § 27-7-41. The Debtor did not pay individual income taxes or file individual income tax returns for the periods of January 1, 2005 through December 31, 2011. The Debtor was audited for these income tax periods and issued the Income Tax Assessments pursuant to MISS. CODE ANN. § 27-7-53(2) which states, in pertinent part:

---

[16] Counsel for the debtors in *Fugitt II* is the same counsel who represents the Debtor in this Bankruptcy Case.

> If no return is made by a taxpayer required by this chapter to make a return, the commissioner shall determine the taxpayer's liability from the best information available, which determination shall be prima facie correct for the purpose of this article.

*Id.*

The Debtor maintains that MISS. CODE ANN. § 27-7-51 does not grant the MDOR the same presumption of correctness as provided sales tax assessments in MISS. CODE ANN. § 27-65-37, and that he has provided the Court with sufficient documents to show that the Income Tax Assessments are overstated and should be reduced.  Under MISS. CODE ANN. § 27-7-53(2), "[i]f no return is made by a taxpayer required by this chapter to make a return, the commissioner shall determine the taxpayer's liability from the best information available which determination shall be prima facie correct."  *Id.*; *see McCoy v. Miss. State Tax Comm'n (In re McCoy)*, Adv. Proc. No. 08-00175-EE, 2009 WL 2835258, at *7 (Bankr. S.D. Miss. Aug. 31, 2009), *aff'd*, No. 3:09-CV-575-HTW-LRA, 2011 WL 8609554 (S.D. Miss. Feb. 8, 2011), *aff'd*, 666 F.3d 924 (5th Cir. 2012).  Accordingly, the Court finds that the presumption of correctness applies to the Income Tax Assessments as well as the Sales Tax Assessments.  For the same reasons discussed with regard to the accuracy of the Sales Tax Assessments, the Court finds that the Debtor has failed to raise summary judgment evidence disputing the *prima facie* valid Income Tax Assessments.

**E.    Dischargeability of Taxes**

Generally, in a chapter 7 bankruptcy case, an individual debtor receives a discharge from all personal liabilities that arose before the bankruptcy petition was filed.  11 U.S.C. § 727(b).  Certain types of debts, however, are excepted from discharge.  *Id.* ("Except as provided in Section 523 of this title, a discharge under subsection a of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter.").  The MDOR contends that the Debtor's tax liabilities are nondischargeable under the exceptions in 11 U.S.C.

§ 523(a)(1)(A)-(C), which provides that an individual debtor is not discharged from a tax debt: (1) of the kind specified in 11 U.S.C. § 507(a)(8); (2) with respect to which a return, if required, was not filed; or (3) with respect to which the debtor willfully attempted in any manner to evade or defeat such tax.   11 U.S.C. § 523(a)(1)(A)-(C).   The Debtor's tax obligations are nondischargeable if any one of the exceptions in 11 U.S.C. § 523(a)(1)(A)-(C) are found to exist.

Exceptions to discharge are construed narrowly.  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).  The party opposing a discharge bears the burden of proving the exception to discharge.  *United States v. Coney*, 689 F.3d 365, 371 (5th Cir. 2012). Thus, the burden of proof falls on the MDOR to prove that the Sales Tax Assessments and Income Tax Assessments are nondischargeable by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 285 (1991).

1.   **Sales Tax Debt:  11 U.S.C. § 523(a)(1)(A)—Trust Funds**

A tax liability is nondischargeable under 11 U.S.C. § 523(a)(1)(A) if it qualifies for eighth priority treatment under 11 U.S.C. § 507(a)(8)(C).  *Szostek v. Tex. State Comptroller of Public Accounts (In re Szostek)*, 429 B.R. 552, 561-62 (W.D. Tex. 2010).  Section 507(a)(8)(C) grants eighth priority status to claims for "a tax required to be collected or withheld and for which the debtor is liable in whatever capacity."  11 U.S.C. § 507(a)(8). This category of taxes is commonly known as "trust fund" taxes.  *Szostek*, 429 B.R. at 563.

The MDOR contends that the unpaid sales taxes are trust fund taxes because the Debtor is required by Mississippi law to "collect, insofar as practicable, the amount of the tax due by him from the purchaser at the time the sales price or gross income is collected." Miss. Code Ann. § 27-65-31. Section 27-65-3 defines gross income to include the sale of tangible personal property derived from a business or the total charges for services, that is, compensation for labor

and services performed. *Id*. § 27-65-3. Section 27-65-17 requires that every person engaging in the business of selling personal property, retail or wholesale, shall collect a tax equal to seven percent (7%) of the gross retail sales of the business. *Id*. § 27-65-17. Moreover, Miss. Code Ann. § 27-65-23 levies a seven percent (7%) sales tax on certain miscellaneous business activities. This sales tax obligation is coupled with the requirement in Miss. Code Ann. § 27-65-31, that a taxpayer "add the amount of such tax due by him to the sales price or gross income." Finally, under that same statute, "the funds collected by the taxpayer (seller) from the purchasers . . . shall be considered '*trust funds monies*' and the taxpayer shall hold those funds in trust for the State of Mississippi, said funds to be separately accounted for as provided by regulations of the commissioner." *Id*. (emphasis added).

The MDOR relies on *Alabama Department of Revenue v. Fox (In re Fox)*, 609 F.2d 178 (5th Cir. 1980), for the Fifth Circuit's discussion of the duty imposed on a seller to collect and remit sales taxes to the taxing power and its conclusion that § 17a(1)(e) of the Bankruptcy Act, 11 U.S.C. § 35(a)(1), the precursor to 11 U.S.C. § 507(a)(8)(C), is not limited to "traditional" trust fund taxes but can include sales taxes. According to the MDOR, it does not matter whether the Debtor actually collected the sales taxes, they are trust fund taxes within the meaning of 11 U.S.C. § 507(a)(8)(C) and, therefore, not subject to discharge.

The Debtor makes two arguments in response to the MDOR's contention that the sales taxes are trust fund taxes under 11 U.S.C. § 507(a)(8)(C). First, the Debtor contends that under *Mobility Medical Inc. v Mississippi Department of Revenue*, 119 So. 3d 1002, 1004-05 (Miss. 2013), the Sales Tax Assessments should not be considered "trust fund monies" because the Debtor was not required to collect or withhold them within the meaning of 11 U.S.C. § 507(a)(8)(C). Second, the Debtor contends that the Sales Tax Assessments are more akin to

2e08cb6e06aa68c0

excise taxes under 11 U.S.C. § 507(a)(8)(E) rather than trust fund taxes under 11 U.S.C. § 507(a)(8)(C).  Section 507(a)(8)(E) establishes a priority for "an excise tax on . . . a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition."  11 U.S.C. § 507(a)(8)(E).  An excise tax older than three (3) years, therefore, is dischargeable.

The Debtor's second argument is unclear, but he presumably argues this position because if the sales taxes are excise taxes, rather than trust fund taxes, they lose their priority status after three (3) years. In other words, because the Debtor's Sales Tax Assessments are for the 2005-2011 tax period and the Debtor filed the Petition in 2015, his sales tax liability falls outside the three (3)-year lookback period.  The Debtor's first and second arguments (that sales taxes should not be considered trust funds under *Mobility Medical* and that sales taxes are actually excise taxes in disguise) are similar to the arguments rejected by this Court in *Fugitt II*.

This Court in *Fugitt II* found it unnecessary to apply *Mobility Medical*, a preemption case, because the sales taxes assessed against the debtors were "based on actual deposits into the account."  *Fugitt II*, Adv. Proc. 13-00098-NPO, slip op at 23.  Likewise, in this matter, the Debtor admits that the amounts assessed as sales taxes were "deposited" into the Debtor's account and not remitted to the MDOR.  Also, this Court in *Fugitt II* disagreed with the debtors' "excise tax" argument "that a debtor must collect sales taxes before they may be construed as trust funds taxes under federal bankruptcy law."  *Id.*  For the reasons discussed in *Fugitt II*, the Court agrees with the MDOR and finds that the Sales Tax Assessments are nondischargeable under 11 U.S.C. § 523(a)(1)(A) as a matter of law.

**2.      Sales & Income Tax Debt: 11 U.S.C. § 523(a)(1)(B)—No Tax Returns**

Under 11 U.S.C. § 523(a)(1)(B), a tax debt is excepted from discharge if it is a debt "with respect to which a return, or equivalent report or notice, if required[,] (i) was not filed or given." 11 U.S.C. § 523(a)(1)(B).  It is undisputed that the Debtor did not file income or sales tax returns for the tax years in question.  The MDOR contends that the Debtor's failure to file tax returns renders the Sales Tax Assessments and Income Tax Assessments nondischargeable under 11 U.S.C. § 523(a)(1)(B).  *See McCoy v. Miss. State Tax Comm'n (In re McCoy)*, 666 F.3d 924, 931-32 (5th Cir. 2012);  *In re Green*, 472 B.R. 347, 364-65 (W.D. Tex. 2012).

**a.      Sales Tax Returns**

The MDOR contends that the Debtor was required to file a sales tax return under MISS. CODE ANN. § 27-65-33.  ("The taxpayer shall make a return showing the gross proceeds of sales or the gross income of the business, and any and all allowable deductions, or exempt sales, and compute the tax due for the period covered.").  The Debtor suggests that he was not required to file a sales tax return because he did not collect and remit any sales taxes.  Even if the Debtor had not engaged in any business activities that required him to collect a sales tax, the MDOR interprets MISS. CODE ANN. § 27-65-33 as requiring the filing of sales tax returns during the years he was licensed to do business in Mississippi by virtue of the Sales Tax Permit.  The Court agrees with the MDOR's interpretation and finds that the Debtor's Sales Tax Assessments were not discharged in his Bankruptcy Case because of his failure to file sales tax returns.  11 U.S.C. § 523(a)(1)(B)(i).

**b.      Income Tax Returns**

Because he did not file individual income tax returns for the periods of January 1, 2005 through December 31, 2011, the Debtor conceded in the Debtor's Brief that "he is not eligible

for a discharge [of his income tax liability] as contemplated by *In re McCoy*, 2009 WL 2835258 *7-8 (S.D. Miss. 2009)." (Debtor's Br. at 11). In the Debtor's Letter Brief, however, he asserts that the Debtor's "failure to operate at a profit . . . could be deemed grounds for negating any requirement to file [income tax] returns for those periods." (Debtor's Letter Br. at 2). For this proposition, the Debtor asks the Court to consider the "Internal Revenue Service (IRS) Publication 501, Exemptions Standard Deduction, and Filing Information" (the "IRS Publication") (Debtor's Letter Br. Ex.), a copy of which he attached to the Debtor's Letter Brief. This argument was raised at the Hearing for the first time, but the Court finds that it is sufficiently related to the MDOR's challenge to the legality of the Income Tax Assessments for the Court to consider it as a proper response to the Motion.

The Debtor provides no factual support for his contention that Blalock's Refrigeration was unprofitable during the tax years in question. Moreover, the IRS Publication relates to whether a federal income tax return must be filed and provides no guidance on the filing of state income tax returns under Mississippi law.[17] The Statement of Financial Affairs discloses that the Debtor operated as a sole proprietorship and received gross income from Blalock's Refrigeration in the amounts of $60,000.00 in 2013, $45,000.00 in 2014, and $10,720.00 from January 2015 to May 2015. (Bankr. Dkt. No. 10 at 19). The Court finds that the Debtor's belated, equivocal argument is without any support in the record and, therefore, is insufficient to create a genuine issue for trial. Accordingly, the Court finds that the MDOR is entitled to summary judgment that the Income Tax Assessments are nondischargeable because of the Debtor's failure to file income tax returns during the years in question.

---

[17] According to the MDOR's official website, a Mississippi resident, if single, must file an income tax return if gross income is in excess of $8,300.00 plus $1,500.00 for each dependent. *See* DEP'T OF REVENUE, STATE OF MISS., *Who Should File?* www.dor.ms.gov (Sept. 14, 2015).

**3.     Sales Tax Debt:  11 U.S.C. §523(a)(1)(C)—Willful Evasion of Taxes**

The MDOR also asserts that 11 U.S.C. § 523(a)(1)(C) prevents the discharge of the Debtor's Sales Tax Assessments because of the Debtor's willful evasion of taxes.  That statute prohibits a discharge of tax liability where a debtor has "willfully attempted in any manner to evade or defeat such tax."  11 U.S.C. § 523(a)(1)(C); *see United States v. Mixon (In re Mixon),* No. 05-86866-BJH-7, 2008 WL 2065895, *14 (Bankr. N.D. Tex. May 13, 2008).  The "willful attempt" standard under 11 U.S.C. § 523(a)(1)(C) has been interpreted to contain both a conduct requirement, that the debtor "attempted in any manner to evade or defeat [a] tax," and a mental state requirement, that the attempt was "willful."  *United States v. Stanley*, 595 F. App'x 314, 318 (5th Cir. 2014).

The Fifth Circuit employs a three (3)-pronged test to determine "willfulness:" whether "the debtor (1) had a duty to pay taxes under the law, (2) knew he had that duty, and (3) voluntarily and intentionally violated that duty."  *Id.*  The third prong is satisfied by either "an affirmative act or culpable omission that, under the totality of the circumstances, constituted an attempt to evade or defeat the assessment, collection or payment of a tax."  *Id.* (quoting *Coney*, 689 F.3d at 374, 376).  "[T]he debtor need not have made their attempt with the specific intent to defraud."  *Id.*

The nonpayment of a tax is usually deemed insufficient to bar the discharge of a tax liability in that an honest debtor may fail to pay a debt because of insufficient resources and not because a willful intent to evade a tax.  *In re Birkenstock*, 87 F.3d 947, 951 (7th Cir. 1996).  But the nonpayment of a tax in conjunction with a failure to file tax returns has been held indicative of the requisite willful state of mind. *Bruner v. United States (In re Bruner)*, 55 F.3d 195, 200 (5th Cir. 1995) (citing *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994) for the proposition that 11

U.S.C. § 523(a)(1)(C) includes both acts of commission and acts of omission, such as a failure to pay)).  Similarly, a debtor's failure to pay taxes when he had the ability to pay, although not dispositive, may suggest willfulness.  *Coney*, 689 F.2d at 378 n.4.

According to the MDOR, the evidence establishes that the Debtor willfully attempted to evade or defeat the taxes.  First, the Debtor failed to file any sales tax returns.  (MDOR Exs. 4-8, 10-12, 19-20).  Second, he failed to pay any sales taxes, although he applied for the Sales Tax Permit in 2009, received copies of the tax assessments in the mail, and was notified of the revocation of the Sales Tax Permit in 2011 because of his failure to pay sales taxes.  (MDOR Exs. 2-8, 12, 15-16, 22 & 27).  The following additional conduct, according to the MDOR, establishes willfulness:

> 1.  throwing purchase invoices and sales invoices in the "trash" (MDOR Ex. 4);
>
> 2.  providing Spreadsheets with dates and amounts for deposits that he claimed were loans but providing no documents backing up this claim (MDOR Ex. 4);
>
> 3.  failing to respond to the auditor by January 15, 2010 after receiving the updated assessments (MDOR Ex. 5)
>
> 4.  refusing to speak with the auditor after leaving records at the MDOR; (MDOR Ex. 6);
>
> 5.  using a van in the operation of Blalock's Refrigeration but failing to keep a mileage log (MDOR Ex. 3); and
>
> 6.  failing to file individual income tax returns for approximately eight (8) years (MDOR Ex. 3).

(MDOR's Br. at 28).  The MDOR contends that the Debtor has not presented any reason why he was prevented from filing sales tax returns or paying sales taxes.  The Debtor owns and operates Blalock's Refrigeration and has not alleged any mental or physical disability that prevented him from meeting his financial obligations during the tax years in question.  In Schedule J:  Your

Expenses, his expenses include support obligations, health insurance, and car insurance. (Bankr. Dkt. No. 10 at 16-17). In other words, the Debtor has the ability to pay his ongoing expenses, according to the MDOR. The "debtor's ability to successfully carry out duties in a demanding profession is evidence of a corresponding ability to form a willful mindset to evade tax obligations." *Stanley*, 595 F. App'x at 319. Pursuant to the Statement of Financial Affairs, he received gross income from Blalock's Refrigeration of $60,000.00 in 2013 and $45,000.00 in 2014 (Bankr. Dkt. No. 10 at 19). In Schedule I: Your Income, filed on May 1, 2015, the Debtor reported that he received monthly net income of $2,680.00 from Blalock's Refrigeration and has been "employed there" for the past twenty-nine (29) years. (Bankr. Dkt. No. 10 at 14-15).

The Debtor insists that "willful" intent can only be shown by the discretionary spending exemplified by the debtor in *Stanley*. There, the Fifth Circuit held that the debtor had willfully attempted to evade his income tax liabilities based, in part, on evidence that the debtor had purchased numerous automobiles, a $16,000.00 ring, and a $2,500.00 necklace. *Stanley*, 595 F. App'x at 318-19. The Debtor contends that the spending that the MDOR relies on as evidence of his willfulness is not the same as the discretionary spending in *Stanley*. The Debtor's child support obligation is court-ordered and his health and car insurance policies are required by federal and state law, respectively. Still, the Debtor does not argue that he was unable to pay the sales taxes. To the contrary, he alleges that he paid sales tax to his suppliers on the purchase of units and parts, and, therefore, assumed he was not required to collect sales taxes from his customers.

The Court agrees with the MDOR that the Debtor's argument is based on a series of false assumptions about the Mississippi Sales Tax Law. The Debtor knew he had to pay taxes because he applied for the Sales Tax Permit, the MDOR mailed him with notice of the Sales Tax

Assessments, and the MDOR revoked the Sales Tax Permit in 2011. Applying the three (3)-prong test, the Court finds that Sales Tax Assessments for the years in question are nondischargeable in the Debtor's Bankruptcy Case.  The deposits in the Debtor's account, as shown by the items submitted by the Debtor in the record, indicate that the Debtor earned substantial income and had the financial ability to pay his sales taxes.  The items show that the Debtor charged and collected sales tax from at least one of his customers.  He knew he had a duty to file sales tax returns by virtue of the Sales Tax Permit, even though he now states he believed he owed no sales taxes.  His belief is insufficient to defeat summary judgment.

### 4.    Sales Tax Debt: 11 U.S.C. § 523(a)(1)(A)-(C)

To address fully the dischargeability issues, the Court considers briefly the Debtor's global argument that the Sales Tax Assessments were discharged in his Bankruptcy Case because he was not required to charge, collect, and/or remit any sales tax.  The Debtor repeats this argument throughout the Debtor's Brief in response to all three (3) exceptions to discharge alleged by the MDOR.  (Debtor's Br. at 11-12, 14).  The Debtor's argument follows this logic: because he was under no duty to pay sales taxes, he did not have to collect trust fund monies, he was not required to file a sales tax return, and he could not have willfully attempted to evade the payment of sales taxes.

The Court agrees with the Debtor that the existence of an unpaid tax debt, *inter alia*, is a necessary prerequisite for the dischargeability issue.  For the reasons previously explained, however, the Court already has found that the Sales Tax Assessments owed by the Debtor in this Bankruptcy Case are valid and accurate.  Consequently, the Court finds that the dischargeability issue is not moot but properly before the Court.

**Conclusion**

For the above and foregoing reasons, the Court concludes that the Motion should be granted. The Sales Tax Assessments and Income Tax Assessments are valid as a matter of law, and the Debtor has failed to show that a genuine issue exists to overcome the *prima facie* correctness of the amounts assessed by the MDOR. Moreover, the MDOR is entitled to summary judgment that the Sales Tax Assessments are nondischargeable under 11 U.S.C. § 523(a)(1)(A)-(C) and that the Income Tax Assessments are nondischargeable under 11 U.S.C. § 523(a)(1)(B). The Court will issue a separate final judgment dismissing the Adversary with prejudice.

##END OF OPINION##